**SIGNED THIS: October 31, 2006**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROBERT and JOLENE JOHNSON, | ) | No. 04-83665 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| RICHARD E. BARBER, not personally, but as Chapter 7 Trustee, | ) ) | |
| Plaintiff, | ) | |
| vs. | ) | Adv. No. 05-8034 |
| | ) | |
| FIRST MIDWEST BANK, | ) | |
| Defendant. | ) | |

### O P I N I O N

This matter is before the Court for decision after trial on the adversary complaint of Richard E. Barber, as Chapter 7 Trustee ("TRUSTEE") for the Debtors, Robert and Jolene Johnson, ("DEBTORS"), against First Midwest Bank ("BANK"), to recover monies remaining in an Interest Reserve Account after foreclosure of a failed construction loan.

On March 15, 2003, Robert Johnson ("ROBERT"), a self-employed general contractor, obtained a $313,000 construction loan from the BANK for renovation of

property commonly known as 2307 5th Avenue, Moline, Illinois, and referred to as the Parkside Building Project. The DEBTORS executed a promissory note in favor of the BANK, secured by a Construction Mortgage on the property.[1] The terms of the note provided for regular monthly "interest only" payments for the one-year term, with the entire principal balance becoming due on March 15, 2004.[2] The note also provided for the establishment of a reserve account out of which accrued interest on the loan was to be paid to the BANK. The note provides:

> INTEREST RESERVE. The Loan will include an interest reserve in the amount of $22,690.00 (the "Interest Reserve"). During construction of the Project prior to the Scheduled Completion Date, amounts in the Interest Reserve will be advanced by Lender to pay regularly scheduled interest on the Loan so long as no Event of Default has occurred and so long as the sum of the undisbursed proceeds of the Loan together with any amounts deposited with Lender by the Borrower are sufficient to complete the Project. Interest will be payable by Borrower to Lender on that portion of the Interest Reserve actually disbursed by Lender. The Interest Reserve will not be included in the computation of the undisbursed portion of the Loan for purposes of determining whether the undisbursed portion of the Loan will be sufficient to complete the construction of the Improvements except to the extent that Lender determines in its reasonable judgment that the amount thereof will exceed the amount of interest that will become due and payable on the Loan prior to repayment of the Loan. If, for any reason other than payment by Borrower of interest from other than Loan funds, Lender does not advance funds from the Interest Reserve to pay interest when due, Lender shall so notify Borrower, and of the reason therefor, and Borrower shall have a period of ten (10) days from such notification to pay the interest due; provided, however, that Lender shall not be required to make any advances under the Loan until such time as such interest is paid.

Pursuant to the promissory note, on March 25, 2003, a savings account was established in the names of ROBERT and Jolene Johnson, with a transfer of $22,690. These funds were

---

[1] Although Jolene signed the loan documents and is shown as a co-owner on the account, she was not an active participant in the construction business.

[2] The parties anticipated converting the short-term construction loan to long-term financing when the renovation work was completed.

2

advanced by the BANK. The signature card for the account, bearing the DEBTORS' signatures, identified it as a business escrow account. Automatic deductions were taken by the BANK each month from the deposited funds to pay monthly interest on the construction loan until January 15, 2004.[3] No other withdrawals were made. In addition, interest was credited to the account each month until March 31, 2006.

By the end of 2003, ROBERT was financially unable to proceed with the renovation because of cost overruns and the BANK was unwilling to advance additional funds. After negotiations, on February 27, 2004, the DEBTORS entered into an agreement with the BANK for a deed in lieu of foreclosure, whereby the DEBTORS agreed to quit claim their interest in the property to the BANK and the BANK agreed to pay certain outstanding bills incurred in connection with the renovation, outstanding real estate taxes and $500 in attorney fees to William Laird, ROBERT'S attorney. The DEBTORS executed a quit claim deed to the property on February 27, 2004, which was recorded on March 4, 2004.

On May 13, 2004, ROBERT appeared at the BANK and requested that the Interest Reserve Account be closed. A teller issued him an Official Check for the account balance in the amount of $10,053.90. Believing the issuance of the check to have been in error, the BANK stopped payment on the check. On June 18, 2004, the DEBTORS' attorney wrote the BANK demanding payment of the funds. On July 20, 2004, the BANK responded by letter, asserting its right of setoff.

---

[3]The following payments were deducted from the account on the dates noted:

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 04-15-03 | $ 437.96 | 08-15-03 | $1,200.02 | 12-15-03 | $1,749.77 |
| 05-15-03 | 853.12 | 09-15-03 | 1,293.78 | 01-15-04 | 1,904.22 |
| 06-16-03 | 1,131.84 | 10-15-03 | 1,301.57 | | |
| 07-15-03 | 1,167.45 | 11-17-03 | 1,685.66 | | |

3

ROBERT and Jolene filed a joint Chapter 7 petition on August 13, 2004. On Schedule B the DEBTORS disclosed a contingent claim against the BANK for stopping payment on the check. The TRUSTEE filed a two-count complaint against the BANK, alleging in Count I that it had wrongfully dishonored the check. In Count II, the TRUSTEE alleges that the BANK owed the DEBTORS $10,053.90 as of the filing of the petition and that he was entitled to turnover of the funds. The TRUSTEE filed a motion for summary judgment, contending that the BANK'S acceptance of a deed in lieu of foreclosure extinguished the DEBTORS' obligation to the BANK and that absent fraud, a bank cannot stop payment on a check. This Court denied the TRUSTEE'S motion, determining that the issue of the DEBTORS' right to the account balance presented a disputed issue of material fact. *In re Johnson*, 2005 WL 3506592 (Bankr.C.D.Ill. 2005). The Court concluded that if the DEBTORS were not entitled to the funds, the BANK'S failure to pay was not wrongful.

A trial was held on June 23, 2006.[4] Chad Ulrich, the loan officer at the BANK at the time the construction loan was made, testified. Mr. Ulrich testified that a separate loan agreement would have been entered into at the time the loan was placed into term financing. He testified that he went over the terms of the construction draw-down with ROBERT at the time of closing. Ulrich explained that an "escrow business account" was established with a portion of the loan proceeds in order to make the interest payments during the construction phase and that ROBERT agreed to the arrangement. Ulrich was not involved in the negotiations between the DEBTOR and the BANK after the BANK declined to loan additional funds. When Ulrich was advised by an employee of the BANK

---

[4] At the close of the TRUSTEE'S case, at his request, the Court reserved the issue of the TRUSTEE'S right to attorney fees under 810 ILCS 5/3-411.

4

that a check from the Interest Reserve Account had been issued to ROBERT, he telephoned him in an attempt to discuss the check. ROBERT declined to discuss the matter and Ulrich and his supervisor decided to stop payment on the check on the basis that the account was an Interest Reserve Account.

William Laird, the attorney who represented the DEBTORS after the project failed, also testified. Laird testified that he had represented ROBERT in the purchase of the real estate, but not in the procurement of funds for its renovation. In January or February of 2004, ROBERT discussed his financial difficulties with Laird and advised him that he was willing to give the property back to the BANK and that the BANK had indicated it would be amenable to a deed in lieu of foreclosure. Laird drafted the agreement for deed in lieu of foreclosure and forwarded it to the BANK for execution. The BANK prepared the quit claim deed and sent it to Laird for execution by the DEBTORS. Laird testified that at no time during the negotiations or at the time the documents were executed was any reference made by either ROBERT or the BANK to the Interest Reserve Account, and that he was unaware of the existence of the account.

Laird first learned of the Interest Reserve Account in mid-May, 2004, when ROBERT called him to inquire what he should do with the balance of the funds remaining in the Interest Reserve Account. Because the account was held in the DEBTORS' names, Laird advised ROBERT that he could withdraw the funds. After obtaining the Official Check, ROBERT deposited the funds in his checking account and proceeded to write checks in payment of various bills. After the BANK stopped payment on the check, ROBERT was unable to cover the checks he had written. Laird testified that the BANK had made no mention of its right of setoff until its letter to him of July 20, 2004.

5

Neither of the DEBTORS testified. After hearing argument, the matter was taken under advisement by the Court.

In its decision denying the TRUSTEE'S Motion for Summary Judgment, this Court ruled that the TRUSTEE could not prevail on his claim against the BANK under UCC Section 3-411(b) for wrongful refusal unless it is established that the BANK'S nonpayment of the check was without justification. Similarly, the TRUSTEE cannot prevail on his motion for turnover unless this Court would determine that the funds in the Interest Reserve Account are property of the bankruptcy estate and that the BANK is not entitled to exercise a right of setoff. Thus, the preliminary issue is the determination of the relative rights to the funds which were held in the Interest Reserve Account. If the Court determines that the DEBTORS had an interest in the funds, the Court will consider the effect of the agreement entered into by the parties and whether the BANK is entitled to set off the funds.

The establishment of an Interest Reserve Account such as the one between the DEBTORS and the BANK is a common commercial practice for lending institutions financing construction projects. An Interest Reserve Account is an express contractual designation of a portion of the loan to be used to pay interest that will accrue on that loan. *Rebman v. Flagship First Nat. Bank of Highlands County*, 472 So.2d 1360 (Fla.App. 2 Dist. 1985). The nature of such accounts was explained by the court in *Rebman*:

> An interest reserve, essentially, is a designation of a portion of the amount of a loan to be used to pay interest that will accrue on that loan. For example, in a typical real estate construction loan a lender recognizes that the borrower does not have the funds to pay interest on the loan during construction and expects the interest to be repaid from the proceeds of a permanent mortgage loan obtained after construction is complete or from

revenues generated by the sale or operation of the project after completion of construction. Construction frequently is not completed for several years and lenders for purposes of their own financial accounting want to obtain interest during that period even though the borrower does not have the funds to pay that interest. Thus, the expediency has been developed by which the lender loans additional sums to the borrower from time to time to permit that borrower to pay interest to the lender. As the technique has been refined, the amount required for interest is built into the construction loan at the outset. For example, in a $1,000,000 construction project contemplated to take one year to build, a lender might determine that the probable interest that would accrue during the year would be $50,000. The lender then would agree to lend the borrower $1,050,000, permitting the borrower to draw on up to $1,000,000 of that amount for payment of construction costs and up to $50,000 of that amount to repay monthly interest charged by the lender.

The TRUSTEE contends that the funds in the Interest Reserve Account are property of the bankruptcy estate and that the DEBTORS' right to the funds remained unaffected by the parties' agreement for a deed in lieu of foreclosure. The BANK contends that the DEBTORS' interest in the funds was limited by the nature of the account as an escrow arrangement and also asserts that the DEBTORS waived any claim to the funds in the agreement for deed in lieu.

The relationship between a bank and its depositor is contractual in nature. *Continental Cas. Co., Inc. v. American National Bank and Trust Co. of Chicago*, 329 Ill.App.3d 686, 768 N.E.2d 352 (Ill.App. 1 Dist. 2002). Ordinarily, the contract is memorialized by a signature card that is signed by the depositor upon opening the account and a deposit agreement. Other documents, however, may be integrated into the contractual relationship. *See Suburban Bank of Hoffman-Schaumburg v. Bousis*, 144 Ill.2d 51, 578 N.E.2d 935 (1991). A contract solely drafted by a bank is to be construed most strongly against the bank. *Your Style Publications, Inc. v. Mid Town Bank and Trust Co. of Chicago*, 150 Ill.App.3d 421, 501 N.E.2d 805 (Ill.App. 1 Dist. 1986).

7

In the present case, the contract between the DEBTORS and the BANK consisted of the signature card, the promissory note and the construction mortgage. The account was opened in the names of the DEBTORS and was funded with a portion of the loan proceeds. The signature card admitted into evidence consists of a one-sided single page document. The printed form shows the account titled in the names of both DEBTORS and contains their address, signatures and agreement to the terms and conditions governing the account and the rules and regulations of the BANK. Under the heading that reads "Type of Ownership," several designations are listed with boxes for the depositor to check the type of account being created. Among the categories listed are individual, joint tenancy with right of survivorship, joint tenancy without right of survivorship, sole proprietorship, partnership, corporation, nonprofit corporation and organization. A check mark is placed in the box marked "Other" with the notation "Escrow Business Acct" typed in. The signature card provides that one signature was required for withdrawals.

The records of the BANK characterize the account as an "escrow" account.[5] Merely attaching the label "escrow" to property or to a document does not make it such, however. *See In re ANR Advance Transp. Co., Inc.*, 247 B.R. 771 (Bankr.E.D. Wis. 2000). Under Illinois law, an escrow is "a written instrument which by its terms imports a legal obligation, and which is deposited by the grantor, promisor or obligor, or his agent with a stranger or third party, to be kept by the depository until the performance of a condition or the happening of a certain event and then to be delivered over to the grantee, promisee or obligee." *Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.*, 272 Ill.App.3d 370, 379, 649 N.E.2d

---

[5] In the bankruptcy context, as a general rule, money held in a "true" escrow account is not property of the debtor's estate. *Matter of Kemp*, 52 F. 3d 546 (5th Cir. 1995).

511, 517 (Ill.App. 1 Dist. 1995). An escrow account is defined as "[a] bank account, generally held in the name of the depositor and an escrow agent, that is returnable to the depositor or paid to a third person on the fulfillment of escrow condition." *In re Handy Andy Home Imp. Centers, Inc.*, 196 B.R. 87 (Bankr.N.D.Ill. 1996)( quoting *Black's Law Dictionary* (6th ed.)).

Neither the BANK'S characterization of the account as an "escrow" account, nor the description on the signature card of the account as an "escrow" account is determinative of the DEBTORS' right to the balance of the funds. No evidence was offered of the existence of a written deposit or escrow agreement. The note provides for the establishment of an "interest reserve" of $22,690 and that during the project's construction, "amounts in the Interest Reserve will be advanced by the [BANK]." In accordance with that provision, the BANK administered the account during the term of the construction project and the only withdrawals from the account were used to make interest payments on the construction loan. Neither the note nor the construction mortgage contain any provision for disposition or distribution of any balance remaining after the completion of the project or upon the DEBTORS' default. The BANK'S loan officer offered no testimony as to any other agreement with the DEBTORS concerning the account. Nor was any documentation or testimony offered as to the BANK'S rules or regulations governing accounts designated as "escrow" accounts.

In the present case, the funds represented a portion of the loan proceeds and were deposited in an account titled in the DEBTORS' names. Because the terms of the note did not restrict the DEBTORS' rights to any balance remaining in the account or grant the

BANK any additional rights other than the right to advance the interest payments due on the loan, the monies in the Interest Reserve Account belonged to the DEBTORS.

In essence, the BANK is seeking reformation of the promissory note and contract governing the account. The court in *Suburban Bank of Hoffman-Schaumburg v. Bousis*, 144 Ill.2d 51, 578 N.E.2d 935 (1991), rejected a similar claim made by the bank to funds held in a "routine" savings account in the daughter's name based on the bank's contention that the parties intended the funds to be applied to a debt owing the bank by the father of the account holder. Addressing the bank's argument that the documentation establishing the daughter as legal owner should not be enforced because it did not reflect the parties' agreement for the ultimate distribution of the funds, the court stated:

> A written contract may be reformed to reflect the intention of the parties and the agreement between them. This court has stated:
>
>> "An action to reform a written agreement rests upon a theory that the parties came to an understanding, but in reducing it to writing, through mutual mistake, or through mistake of one side and fraud on the other, some provision agreed upon was omitted, and the action is to so change the instrument as written as to conform it to the contract agreed upon, by inserting the provisions omitted or striking out the one inserted by mutual mistake." (*Harley v. Magnolia Petroleum Co.* (1941), 378 Ill. 19, 28, 37 N.E.2d 760.)
>
> It is assumed that the parties' written agreement expresses their mutual intentions, and this conclusion will not yield to any other unless the contrary evidence is clear and convincing. (*Harley*, 378 Ill. at 27, 37 N.E.2d 760). For the reasons set out below, we conclude that the bank, having been allowed to introduce parol evidence in support of its claim, failed to present clear and convincing proof that the account contract should be reformed.
>
>> The bank failed to show that the agreement between the parties was intended to include language limiting the use of the account proceeds, nor did the bank show that by mutual mistake this language was not included in the account contract. The evidence clearly establishes that the parties

intended for the account contract, as written, to apply to the funds on deposit. The bank's intention to open a routine savings account was confirmed when bank president Short testified at trial that the savings account "was strictly my idea." In light of that testimony, we note that Short chose to establish a routine savings account in [the daughter's] name alone, though he could have instead established a custodial account, a trust account, or an escrow account to memorialize a different understanding for the control of the funds. It may be noted that the two promissory notes granted the bank a right of set-off or lien against deposits made by its borrowers. (*See also Gluth Brothers Construction, Inc. v. Union National Bank* (1988), 166 Ill.App.3d 18, 116 Ill.Dec. 365, 518 N.E.2d 1345). The bank supplied the savings account contract to its depositor, and thus was not in any respect at a disadvantage or on unequal footing when it entered into the agreement with [the daughter]. If Short had believed that the funds were intended to reduce [the father's] liability on the notes, the bank could have accepted the funds and applied them directly to the debts.

>Equity cannot make a new agreement for the parties under the color of reforming the one made by them, nor can it be used to add a provision to the contract that was never agreed upon. (*Harley*, 378 Ill. at 28, 37 N.E.2d 760).

Concluding that the account contract was unambiguous, judicial reformation was denied. For the same reasons here, this Court determines that the funds remaining in the Interest Reserve Account, established as a savings account in the name of the DEBTORS without any stated restrictions or conditions, belonged to the DEBTORS.

Given that determination, the next issue to be addressed is the effect of the agreement for deed in lieu of foreclosure upon the DEBTORS' right to the funds. A deed in lieu of foreclosure is a voluntary conveyance by the mortgagor of the mortgaged property to the secured party as an alternative to proceeding under applicable state law to foreclose the owner's equity of redemption. In his closing argument, the TRUSTEE identified Section 15-1401 as dispositive. That section provides:

>The mortgagor and mortgagee may agree on a termination of the mortgagor's interest in the mortgaged real estate after a default by a

11

> mortgagor. Any mortgagee or mortgagee's nominee may accept a deed from the mortgagor in lieu of foreclosure subject to any other claims or liens affecting the real estate. Acceptance of a deed in lieu of foreclosure shall relieve from personal liability all persons who may owe payment or the performance of other obligations secured by the mortgage, including guarantors of such indebtedness or obligations, except to the extent a person agrees not to be relieved in an instrument executed contemporaneously. A deed in lieu of foreclosure, whether to the mortgagee or mortgagee's nominee, shall not effect a merger of the mortgagee's interest as mortgagee and the mortgagee's interest derived from the deed in lieu of foreclosure. The mere tender of an executed deed by the mortgagor or the recording of a deed by the mortgagor to the mortgagee shall not constitute acceptance by the mortgagee of a deed in lieu of foreclosure.

735 ILCS 5/15-1401. The TRUSTEE contends that upon the BANK'S acceptance of the deed in lieu of foreclosure, the DEBTORS' liability was extinguished because the parties made no agreement to the contrary.

The TRUSTEE'S reading of the statute is cursory. He focuses on the third sentence and neglects the fourth sentence entirely. The purpose of the statute is to permit a borrower to transfer title to the lender in exchange for a release of his or her obligations under the note and mortgage. *Olney Trust Bank v. Pitts*, 200 Ill.App.3d 917, 558 N.E.2d 398 (Ill.App. 5 Dist. 1990). Rejecting the contention that the term "personal liability" meant the existing mortgage debt on the promissory notes prior to foreclosure, the court in *Olney* construed the statute to provide for a release of personal liability for the deficiency judgment that might otherwise result from foreclosure. Noting that the following sentence of the statute specifically provides that acceptance of a deed in lieu of foreclosure would not effect a merger of the mortgagee's interest as mortgagee and the interest acquired by that deed, the court concluded that the mortgage debt is neither satisfied nor extinguished.

12

The court drew an analogy to a discharge in bankruptcy, stating:

> To illustrate the effect of non-merger of the lien and title interest by way of analogy, the release of the deficiency judgment received by the mortgagor in exchange for the deed in lieu of foreclosure is similar to the discharge received by a debtor in bankruptcy. While it is a general rule that a release of the debt secured by a mortgage operates as a discharge of the mortgage, a basic tenant of bankruptcy law holds that a discharge in bankruptcy releases the debtor from *personal liability* but does not discharge the mortgage lien. (Citation). The mortgagee may foreclose the mortgage lien following a mortgagor's discharge in bankruptcy but is forbidden from obtaining or enforcing a deficiency judgment against the mortgagor. . . .
>
> In summary, a discharge in bankruptcy does not constitute payment or extinguishment of obligations which are discharged but merely serves to bar their enforcement by legal proceedings. We likewise interpret section 15-1401 and hold that acceptance of the deed in lieu of foreclosure does not extinguish the mortgage debt, but does bar the mortgagee from obtaining or enforcing a deficiency judgment. . . .

Accordingly, the effect of the BANK'S acceptance of the deed in lieu of foreclosure prevents it from enforcing a deficiency judgment against the DEBTORS.

Moreover, the use of the adjective *personal* in the phrase "shall relieve from personal liability," must be given effect as a term intended to narrow the kind of liability from which the obligor is relieved. In the arena of law, its use signals an intent to distinguish *in personam* liability from *in rem* liability. Claims or rights that are *in rem*, directed against specific property, are not discharged by operation of 735 ILCS 5/15-1401. The phrase "except to the extent a person agrees not to be relieved in an instrument executed contemporaneously," refers to an agreement that preserves *personal* liability. A contemporaneous agreement is not needed to preserve a creditor's present rights against other property, i.e., other than the mortgaged real estate. Thus, the absence of a

contemporaneous agreement did not affect the BANK'S right of setoff against the Interest Reserve Account, which right was in existence and enforceable when the deed in lieu transaction occurred.

The next question to be addressed is whether the BANK released its right of setoff against the DEBTORS in the agreement for deed in lieu of foreclosure. In order to answer that question, the nature and extent of the BANK'S rights must first be determined.

The Bankruptcy Code preserves, with exceptions not relevant here, the rights of setoff which exist outside bankruptcy. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995); *United States v. Maxwell*, 157 F.3d 1099 (7th Cir. 1998). Described generally, "[t]he right of setoff (also called offset) allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Strumpf,* 516 U.S. at 18, 116 S.Ct. at 286. Setoff applies when a debtor and a creditor have mutual prepetition claims against one another. *In re Bourne*, 262 B.R. 745 (Bankr.E.D.Tenn. 2001). Although a party may waive its right of setoff, the contractual language must be precise and unequivocal. *In re Carlyle*, 242 B.R. 881 (Bankr.E.D.Va. 1999). Moreover, action taken by a creditor, such as an erroneous transfer of funds by a bank to a bankruptcy trustee without realization of a claim against the debtor, will not necessarily preclude setoff. *In re Tilston Roberts Corp.*, 75 B.R. 76 (S.D.N.Y. 1987).

The relationship between a bank and its depositor is that of debtor and creditor. *Paskas v. Illini Federal Sav. & Loan Ass'n*, 109 Ill.App.3d 24, 440 N.E.2d 194 (Ill.App. 5 Dist. 1982). The general rule in Illinois is that a bank has the power to apply a deposit to the

14

payment of a depositor's indebtedness when the debts are mutual between the parties. *Symanski v. First Nat. Bank of Danville*, 242 Ill. App. 3d 391, 609 N.E. 2d 989 (Ill.App. 4 Dist. 1993). In addition to its common law right of setoff, the promissory note grants the BANK a right of setoff against accounts held by the DEBTORS. The paragraph governing the right of setoff provides:

> To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

The question of release is one of contract. The agreement for deed in lieu of foreclosure contains the following provision:

> The Bank shall accept said Quit Claim Deed in lieu of foreclosure and all right, obligations, remedies or other causes of actions under the Promissory Note, Construction Mortgage and Assignment of Rents are deemed executed. Borrowers shall have no further obligation to the Bank and the Bank shall have no further recourse towards borrowers with regard thereto.[6]

A release is a contract in which "a party relinquishes a claim to a person against whom the claim exists." *Capocy v. Kirtadze*, 183 F.3d 629 (7th Cir. 1999)(applying Illinois law). As such, it is subject to the rules governing the construction of contracts. *Thornwood, Inc. v. Jenner & Block*, 344 Ill.App.3d 15, 799 N.E.2d 756 (Ill.App. 1 Dist. 2003). Where the

---

[6]Under any reasonable interpretation, this provision does not constitute an affirmative waiver by the DEBTORS of their interest in the funds contained in the Interest Reserve Account. The Court rejects the BANK'S contention to the contrary.

15

terms of a release are clear and explicit, the release will be enforced as written. *Loberg v. Hallwood Realty Partners, L.P.,* 323 Ill.App.3d 936, 753 N.E.2d 1020 (Ill.App. 1 Dist. 2001). Whether the language of a contract is ambiguous is initially, a question of law for the court. *Quake Const., Inc. v. American Airlines, Inc..* 141 Ill.2d 281, 565 N.E.2d 990 (1990). Disagreement over the meaning of a contract does not automatically make it ambiguous. *Reynolds v. Coleman*, 173 Ill.App.3d 585, 527 N.E.2d 897 (Ill.App. 1 Dist. 1988). If a contract is determined by the court to be ambiguous as a matter of law, parol evidence is admissible to ascertain the parties' intent. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill.2d 440, 447, 581 N.E.2d 664 (1997).

The TRUSTEE characterizes the above-quoted provision as a general release, the effect of which was to waive any right of setoff. The provision's language, however, rather than being phrased in broad, general terms, refers specifically to rights and remedies under the Note, Mortgage and Assignment of Rents.[7] Although the BANK'S contractual right of setoff originates from those documents, its common law right of setoff does not and is a separate right.

In addition, the phrase "deemed executed" is a poor choice of words and does not carry the same meaning as *waived* or *released*. *Executed* means "completed; carried into full effect; already done or performed; signed; taking effect immediately; now in existence or in possession; conveying an immediate right or possession." *Black's Law Dictionary* (5th. ed. 1979). *Deem* means "to hold; consider; adjudge; believe; condemn; determine; treat as

---

[7]That limitation is expressed in the first sentence and is incorporated by reference into the second sentence by the final phrase "with regard thereto."

16

if; construe." *Id.* Thus, *deemed executed* could reasonably be construed to mean "considered to take effect immediately" or "determined to convey the immediate right or possession." As such, the first sentence could reflect an intent to grant the BANK the immediate right to perform the remedies provided in the loan documents, which include the right to freeze the account and exercise a setoff by crediting the funds to the loan balance. Its meaning is unclear.

In addition, the phrase "the Bank shall have no further recourse towards borrowers" is also not clear. Rather than constituting a general release of all rights as the TRUSTEE contends, it is reasonably interpreted as a release of personal liability only as the words "towards borrowers" indicate. This interpretation is also consistent with the effect of a deed in lieu of foreclosure under 735 ILCS 5/15-1401.

Where a provision is ambiguous, parol evidence must be considered. ROBERT failed to testify, so there is no evidence in the record of his intent. His lawyer, William Laird, was unaware of the existence of the Interest Reserve Account when he drafted the agreement for deed in lieu. Chad Ulrich neither signed the agreement nor participated in negotiating or preparing it. No other BANK representative testified. Thus, the record contains no direct evidence as to what was intended.

The circumstantial evidence makes clear that the funds in the Interest Reserve Account were advanced by the BANK as part of the construction loan amount. The funds were used to pay interest on the loan and for no other purpose. After the DEBTORS defaulted and conveyed the real estate back to the BANK by deed in lieu of foreclosure,

Chad Ulrich and his supervisor, who together made the decision to stop payment of the Official Check, believed that the BANK, not the DEBTORS, were entitled to the funds. Given that the funds were part of the loan proceeds advanced by the BANK and were deposited in a special purpose account, which purpose was no longer in effect, this belief was reasonable. Thus, the circumstantial evidence shows that the BANK, through its officers, acted as if the BANK'S right to offset the funds was not released or waived.[8]

ROBERT'S actions, on the other hand, were dictated by advice from his lawyer who was unfamiliar with the account, whose advice was sought because ROBERT did not know what to do about the funds. The TRUSTEE points out that the BANK failed to exercise the setoff. While this failure could reflect a belief by the BANK that it had no such right, it just as easily could be indicative of uncertainty or caution, particularly after ROBERT'S lawyer became involved. In any event, the BANK did freeze the account as soon as an officer with knowledge of its status as an Interest Reserve Account became aware of ROBERT'S withdrawal attempt. In addition, since the agreement was drafted by the DEBTORS' attorney, ambiguities must be construed against them. *See Dowd & Dowd, Ltd. v. Gleason,* 181 Ill.2d 460, 479, 693 N.E.2d 358 (1998).

This Court holds that the agreement for deed in lieu of foreclosure clearly and unambiguously does not provide for a release of the BANK'S common law right of setoff. That right remained available to the BANK at the time the Official Check was issued and constitutes a valid justification for stopping payment.

---

[8] The person that issued the Official Check was a teller, not an officer. There is no evidence that the teller consulted with or sought approval from anyone before issuing the check.

As an alternative basis for decision, the provision in the agreement for the BANK to release the DEBTORS is ambiguous as to the extent of the release. Upon consideration of parol evidence, and in view of the rule of contract construction that ambiguities should be construed against the drafter, the Court determines that the agreement was not intended to release the BANK'S right to setoff the Interest Reserve Account funds.

For these reasons, judgment shall be awarded to the BANK. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###